Lisa M. BROWN, et al, Plaintiffs,

v.

MINISTRY OF DEFENSE OF the UNITED KINGDOM OF GREAT BRITAIN, United Kingdom of Great Britain, the United States of America, Defendants.

Civ. A. No. 87–382–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 8, 1988.

Girard C. Larkin, Jr., Virginia Beach, Va., Steven G. Schwartz, Alexandria, Va., for plaintiffs.

Raymond A. Jackson, Norfolk, Va., Irving A. Pianin, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendants.

## ORDER

DOUMAR, District Judge.

Plaintiffs, two civilians not employed by the Armed Forces, were injured while visiting the United Kingdom of Great Britain merchant ship R.F.A. OLNA while it was docked at the Norfolk Naval Base. The OLNA was in Norfolk as a component of a United Kingdom naval force which was participating in the NATO combined naval training operation known as "Ocean Safari." The plaintiffs brought this action, alleging tort actions in admiralty, against the United Kingdom of Great Britain (U.K.) and the Ministry of Defense for the U.K. On February 24, 1988, in open court, the court granted plaintiffs' motion for leave to amend their complaint to add the United States as a party defendant pursuant to Rule 15(a).

The defendants U.K. and Ministry of Defense for the U.K. have moved to dismiss pursuant to Rule 12(b)(6) and defendant United States has moved for dismissal pursuant to Rule 12(b)(1) and the Statute of Limitations, asserting this court lacks subject matter jurisdiction over the case against the United States and that this case is barred by the applicable statute of limitations.

For the reasons stated below, all defendants' motions to dismiss are GRANTED.

## I. FACTS

On August 27, 1985 the plaintiffs visited the British Merchant Ship R.F.A. OLNA after being invited to do so by one of the OLNA's crewmen, a merchant seaman. At this time, the OLNA was docked at Pier 20, Norfolk Naval Base, Norfolk, Virginia, and was a component of a British naval force which was participating in a NATO exercise. After the visit, while the plaintiffs departed the vessel, the OLNA gangplank collapsed resulting in personal injuries to both plaintiffs. Plaintiffs allege their injuries were caused by defendants' "negligence and wrongdoing ... in their failure to properly secure the gangplank; in failing to maintain it in a proper and safe condition; and in their failure to make said gangplank safe for use in boarding and departing from the said vessel." Complaint, ¶ 7. The plaintiffs then filed this action on June 9, 1987 alleging tort action in admiralty.

## II. DISCUSSION

### 1. *The NATO–SOFA Scheme*

For reasons fully set forth below, defendants argue that application of the NATO–SOFA will bar prosecution of this action. Plaintiffs counter that the treaty is not applicable and, alternatively, that application would not bar this action.

At all times material to this case, the United Kingdom of Great Britain and the United States were ratified signatories to the NATO–SOFA 4 U.S.T. 1792 (June 9, 1951). The "purpose of the [SOFA] is to define the legal status of the organs of the North Atlantic Treaty Organization and of the military forces of one NATO power stationed in the territory of another NATO power. The [SOFA] covers not only military forces but also their civilian components." Status of Forces of the North Atlantic Treaty: Supplementary Hearing Before the Comm. on Foreign Relations, 83d Cong., 1st Sess. 1 (1953) (statement of Sen. Alexander Wiley, Chairman, Senate Comm. on Foreign Relations). Significantly, the NATO–SOFA defines the legal status, under both civil and criminal laws, for hundreds of thousands of United States military personnel now serving in NATO countries. It is crucial that the court carefully construe this treaty in order to effectuate fully its intended purpose. To misconstrue or misapply the treaty could have far reaching effects insofar as misapplication could alter application of the NATO–SOFA to hundreds of thousands of American servicepeople in Europe and elsewhere.

The applicability and application of the NATO–SOFA in this case turns upon the claims provisions construction of Article VIII of the NATO–SOFA,[1] the relevant portions of which are set forth as follows:

5. Claims ... arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible, and causing damage in the territory of the receiving State to third parties other than any of the Contracting Parties, shall be dealt with by the receiving State in accordance with the following provisions:—

(a) Claims shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of its own armed forces.

(b) The receiving State may settle any such claims, and payment of the amount agreed upon or determined by adjudication shall be made by the receiving State in its currency.

(c) Such payment, whether made pursuant to a settlement or to adjudication of the case by a competent tribunal of the receiving State, or the final adjudication by such a tribunal denying payment,

---

1. The plaintiffs have argued that paragraph 6 applies. This paragraph is the claims provision relevant to damage caused by NATO personnel not in the line of duty. Here, the damage allegedly arose from the failure of the OLNA's captain to maintain the vessel in a safe condition and to provide a watch. Clearly, these alleged failures were in the line of duty and therefore paragraph 5 applies rather than paragraph 6.

shall be binding and conclusive upon the Contracting Parties.

(d) Every claim paid by the receiving State shall be communicated to the sending States concerned together with full particulars and proposed distribution in conformity with sub-paragraphs (e)(i), (ii) and (iii) below....

....

Defendants assert that the OLNA was part of a "force" or "civilian component" thereof and that the claims provision of Article VIII therefore apply. As such, the defendant asserts that Article VIII, paragraph 5(a) exclusively limits plaintiffs' remedy to one against the United States Government, as though the plaintiffs had been injured on a United States military ship. Under this construction of paragraph 5(a), the OLNA is afforded the judicatory status of a United States warship. By this legal fiction, the plaintiffs' access to a remedy is simplified because the need to serve and sue a foreign country is obviated. In the present case, however, this construction will deny plaintiffs a remedy because they have not complied with the time requirements for bringing this action against the United States.

To the contrary, the plaintiffs urge the court to find that the OLNA was not part of a "force" and that the NATO–SOFA therefore does not apply to this case. In the alternative, plaintiffs argue that even if NATO–SOFA applies, the treaty does not expressly require suit to be brought against the "receiving state" and therefore plaintiffs are not required to sue the receiving State, here the United States, but are free to sue the sending State (U.K.) in a United States Court under United States law.

The court will consider each of plaintiffs' contentions in turn.

**a. Applicability of NATO–SOFA.**

■ The plaintiffs' argument that NATO–SOFA does not apply because the OLNA is not part of a "force" completely ignores the fact that the NATO–SOFA, by its clear terms, also applies to "civilian components." The NATO–SOFA defines a "civilian component" as "the civilian personnel accompanying a force of a Contracting Party who are in the employ of an armed service of that Contracting Party...." NATO–SOFA, Art. I, ¶ 1(b). Defendants have shown, by the uncontradicted affidavit of Michael Antony Holder, Assistant Secretary in the British Civil Service and Director of Supplies and Transport in the Ministry of Defense, that "RFA OLNA was, in August 1985, in company with HMS ILLUSTRIOUS and other British warships and RFA support vessels, preparing for their participation in the major North Atlantic Treaty Organisation exercise 'Ocean Safari'. On August 27, 1985 RFA OLNA was under the operational control of a senior officer of the Royal Navy." Affidavit, ¶ 4. Moreover, the plaintiffs have admitted, by their complaint, that the OLNA was under the control of the U.K. Ministry of Defense. See Complaint, ¶ 2.

The court concludes that the OLNA's personnel were part of a "civilian component" and this alleged incident is within the perview and coverage of the NATO–SOFA which the court finds applicable to the instant case.

**b. Application of NATO–SOFA.**

■ Paragraph five, Article VIII of the NATO–SOFA has never been judicially construed with direct regard to the question whether a civil action against the United States is the exclusive remedy available under the agreement.

The focal point of the court's interpretation of the NATO–SOFA application to the instant case is paragraph 5(a) which states that "[c]laims shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of its own armed forces."

The plain meaning of this provision, as applied to this case, is that suit must be brought under the "laws and regulations" of the United States which govern claims made against the United States itself for injuries resulting from United States armed forces activities. Paragraph 5(a) is not merely a conflict of laws provision. It does

not say only that a civilian injured in the receiving State may sue in the receiving State under the law of the receiving State. Rather, the provision specifically provides further that such suit *"shall"* be brought under the receiving State's laws which govern claims arising from the activities of the receiving State's armed forces. *Id.*

The United States law which governs claims which arise in the United States from injuries sustained by third parties on United States military or support vessels is the Public Vessels Act (PVA), 46 U.S.C. App. §§ 781–790. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *Petition of the United States*, 367 F.2d 505 (3rd Cir.1966), *cert. denied*, 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805 *reh. denied*, 386 U.S. 1000, 87 S.Ct. 1303, 18 L.Ed.2d 354. As such, defendants assert that under the terms of the NATO–SOFA, the PVA provides the exclusive remedy for the paragraph 5 claimants in the instant case and that therefore the court lacks jurisdiction over the case filed against the U.K. under admiralty law.

Further, the use of the mandatory "shall" indicates that the treaty claims provisions were intended as the exclusive scheme under which covered claims were to be made.

Both the case law and legislative history support the proposition that the elements of the sending state "force" or "civilian component" which cause injury in a receiving State are, for the purposes of Article VIII, afforded the judiciary status of the receiving State's own forces. As such, these authorities support the defendants' position that this suit should have been brought against the United States itself under the PVA.

One case has interpreted paragraph 5 with regard to the precise question whether a civilian injured in the receiving State by a member of the Armed Forces of a sending State, while the member is in the line of duty, must resort to paragraph 5 as

the exclusive remedy available and bring a claim. In *Shafter v. United States*, the court held that German civilians injured by United States armed forces in the line of duty in Federal Republic of Germany waters could not sue in a United States court under the PVA but were limited to their remedy under the NATO–SOFA scheme. 273 F.Supp. 152 (S.D.N.Y.1967) *aff'd*, 400 F.2d 584 (2nd Cir.1968), *cert. denied*, 393 U.S. 1086, 89 S.Ct. 871, 21 L.Ed.2d 779. The court reviewed the legislative history of the ratification of the NATO–SOFA stating that

> In giving its assent to NATO–SOFA, the Senate noted specifically both the benefits and the burdens of the jurisdictional agreement. It was observed that disposition of third-party claims by the Government of the place where the asserted wrong occurred (normally the country of the claimant's citizenship or residence ...) would promote fairness, ease friction....

*Shafter*, 273 F.Supp. at 156. The court then concluded that "[i]t seems clear ... that the specific provisions of NATO–SOFA should be read to exclude the concurrent and inconsistent jurisdiction plaintiffs invoke under the Public Vessels Act." [2] *Id.*

Although *Shafter* did not expressly state that suit under paragraph five must be brought against the receiving State itself, the court did quote the legislative history which stated that "[i]n the case of torts committed in the performance of duty, the local citizen who is injured proceeds against his own government exactly as he would if the injury had been caused by a member of his own government's armed forces." *Shafter*, 273 F.Supp. at 156 n. 4 (quoting S.Exec.Rep. No. 1, 83d Cong., 1st Sess. 13–14 (1953)).

The Ninth Circuit has similarly interpreted paragraph five. In *Daberkow v. United States*, 581 F.2d 785 (9th Cir.1978), suit was brought in the United States on behalf of a West German military officer who had

---

**2.** The plaintiffs argue that *Shafter* was rejected by this Court in *Newington v. United States*, 354 F.Supp. 1012 (E.D.Va.1973). However, *Newing-* *ton* held only that a member of a "force" could not be a "third party" under paragraph five and therefore the treaty provision did not apply.

been killed while on duty in the United States. The court rejected the widow's claim under the Federal Tort Claims Act because the West German officer was held to fall under the rule enunciated in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1953) wherein the Supreme Court of the United States held that a United States serviceman injured in the line of duty may not sue the Government under the Federal Tort Claims Act. The court found that "after considering the factors underlying the *Feres* doctrine, we conclude that the District Court properly held the rule enunciated in *Feres* ... should apply with equal force in this case, although the serviceman is not a member of the United States military." *Id.* at 788. The court held that its conclusion that *Feres* applied to foreign force members was buttressed by Article VIII, paragraph five of the NATO–SOFA because, although paragraph five did not precisely cover the facts presented, "the provision does suggest ... that the foreign serviceman is 'assimilated' into the United States military for this limited consideration." *Id.* at 789.

These judicial interpretations are well supported by the legislative history of the ratification of the NATO–SOFA. As noted above, the Senate report expressly stated that an action under paragraph five must be brought against the claimant's own Government. *See Shafter,* 273 F.Supp. at 156 n. 4; S.Exec.Rep. No. 1, 83d Cong., 1st Sess., 13–14 (1953).

That this procedure was clearly intended by the Executive Branch, which negotiated the Treaty, is illustrated by reference to the Defense Department representatives' testimony regarding NATO–SOFA ratification before the Senate Committee on Foreign Relations on April 7, 1953. Mr. Haydock, Counsel for Foreign and Military Affairs, Department of Defense, testified that when a claim arises under paragraph five the "receiving State itself is being sued...." [3] (Committee Transcript, April 7, 1953 at 18). The Committee was also

presented with the following statement from the State Department:

> The American citizen presently injured by NATO personnel in the United States would probably have no other remedy than to proceed against the tort-feasor or if he were acting in the line of duty, possibly to file a claim with the United States Government for presentation to the Government of whose force the tort-feasor was a member. Under the NATO formula, such a claim could be brought against the United States which would process and pay it, thereafter calling upon the NATO country concerned to reimburse it for 75 percent of the compensation paid.

*Id.* at 29.

Legal counsel for the State Department, Mr. Phleger, further stated that "the foreigner with respect to civil claims is in the same status as if he were a member of the United States force ... [this] would put the foreign nation in the position of defending them." Mr. Phleger testified further that

> [b]ecause the foreigner is not under our military jurisdiction, it places the foreign soldier here on duty, and acting in the performance of his duty, in the same status as though he were an American soldier, and to that extent ... it supercedes any law in conflict with that because if he did not have that status he would be treated just like any ordinary civilian.

*Id.* at 73.

The Court finds that the clear import of the Senate report and the testimony of representatives from the Executive Branch is that those officials and Congressmen who negotiated and ratified the NATO–SOFA understood and intended that paragraph five requires suit to be brought against the United States under the laws which govern claims arising from the activities of the United States armed forces. Although the case law is sparse, it is in unanimous accord with this conclusion.

---

**3.** Mr. Haydock provided an example: "If an American Jeep ... runs into a privately owned French vehicle in France, the person who is injured will sue the French Government, and in accordance with whatever the French tort claims procedures are." Testimony of Mr. Haydock, April 7, 1953 at 18.

Moreover, it appears well established that when Congress provides a remedy under the PVA or Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752 (SAA) the PVA or SAA provides the exclusive source of Federal Jurisdiction. *United Continental,* 425 U.S. at 176 n. 14, 96 S.Ct. at 1326–27 n. 14; *McCormick v. United States,* 680 F.2d 345 (5th Cir.1980); *T.J. Falgout Boats, Inc. v. United States,* 508 F.2d 855 (9th Cir.1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975).

Here, because of the applicability and operation of the NATO–SOFA, this court lacks jurisdiction over plaintiffs' admiralty case against the U.K. and the Ministry of Defense for the U.K. Accordingly, the case against these defendants is DISMISSED.

The court concludes further that the exclusive remedy available to the plaintiffs in this case is afforded by paragraph five of the NATO–SOFA. As such, the plaintiffs' only available remedy is against the United States under the PVA.

### 2. *United States' Motion to Dismiss*

The United States has moved the court to dismiss the case against it upon two grounds. First, the Government asserts that the case stated in the amended complaint is barred by the two year statute of limitations applicable here under the SAA and PVA. Secondly, the Government asserts that this court lacks subject matter jurisdiction because the United States was not served with notice of this suit in accordance with the requirements set forth in the SAA and PVA.

### Statute of limitations

■ The incident underlying the complaint in this case occurred on August 27, 1985. The amended complaint, which joined the United States as a defendant, was filed on March 1, 1988—beyond the two year limitation period.

The plaintiffs argue that under FRCP 15(c), the amended complaint should "relate-back" to the time of filing of the original complaint against the U.K., which was filed on June 9, 1987—within the limitation period.

Rule 15(c) provides as follows:

(c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him. . . .

The Government claims that neither the U.K. nor the plaintiffs notified the United States that suit had commenced until after the limitation period, and that therefore relation back cannot occur under Rule 15(c)(1).

The plaintiffs do not claim that the Government received actual notice within the limitation period. Rather, the plaintiffs counter that the purpose of Rule 15(c) is merely to allow suits to proceed, despite expiration of the limitation period, so long as the defendant is not prejudiced thereby. Plaintiffs' Memorandum in Support of Motion to Amend, Jan. 29, 1988, at 11. Further, plaintiffs urge the court liberally to construe the notice requirement of Rule 15(c)(1) to require only that the party to be joined has notice of the incident, not necessarily the actual suit. *Id.* at 12. The plaintiff then asks the court to conclude that the defendants had notice of the incident and will not be prejudiced by the amendment and therefore under Rule 15(c) the amended complaint should relate back.

However, the plaintiffs' arguments are inconsistent with with the express wording of Rule 15(c) and the case law which interprets it.

The Fourth Circuit case of *Weisgal v. Smith*, 774 F.2d 1277 (4th Cir.1985), is particularly instructive. There, a federal prison inmate had instituted a *Bivens* action against certain officials. Subsequently, the prisoner attempted to amend his complaint to state an action against the United States under the Federal Tort Claims Act (FTCA). The Government argued that the limitation period under the FTCA had expired. The prisoner countered that his FTCA complaint should relate back to the filing of his *Bivens* action under Rule 15(c). The court held that the rule clearly requires actual notice within the limitation period and that "absence of proper notice to the United States within the limitations period would result in prejudice by eliminating the statute of limitations defense." *Weisgal*, 774 F.2d at 1279. *See Stewart v. United States*, 655 F.2d 741 (7th Cir.1981) ("Relation back under Rule 15(c) requires ... that actual notice be received by the Government within the period provided by law for commencing the action").

The law appears clear that Rule 15(c) requires actual notice within the limitation period and that prejudice results when a party sought to be joined loses his limitations defense by virtue of the joinder and lack of notice.

In the instant case it is undisputed that the United States did not receive actual notice within the limitation period and that the United States would be prejudiced by its loss of the limitation defense. Accordingly, the Court GRANTS the United States' motion and this case is DISMISSED.

Because the case against the United States is dismissed on limitation grounds, it is not necessary to consider the United States' challenge to the court's subject matter jurisdiction.

The Clerk is DIRECTED to send a copy of this order to all counsel of record and to the Attorney General of the United States.

IT IS SO ORDERED.