**Kaj AASKOV, et al., Plaintiffs,**

v.

**Edward C. ALDRIDGE, Jr., et al., Defendants.**

**Civ. A. No. 88–0221–LFO.**

United States District Court, District of Columbia.

Aug. 25, 1988.

Anthony Z. Roisman, Ann C. Yahner, Richard S. Lewis, Cohen, Milstein & Hausfeld, Washington, D.C., for plaintiffs.

Vincent M. Garvey, Jerome L. Epstein, Attys., Dept. of Justice, Washington, D.C., for defendants.

### MEMORANDUM

OBERDORFER, District Judge.

165 Danish citizens and one American citizen filed claims with the U.S. Air Force on January 19, 1988, seeking damages from injuries stemming from the January 21, 1968 crash near Thule, Greenland, of a U.S. Air Force Strategic Air Command B–52 bomber carrying four 1.1 megaton hydrogen bombs. Plaintiffs sought consideration by a foreign claims commission pursuant to the Foreign Claims Act, 10 U.S.C. § 2734 (1982), but on January 27, 1988, the Air Force forwarded these claims to the Danish government pursuant to the NATO Status of Forces Agreement ("SOFA") and the International Agreement Claims Act, 10 U.S.C. §§ 2734a, 2734b (1982).

On Jan. 28, 1988, plaintiffs filed this action seeking an injunction ordering the Air Force to settle the claims and a declaratory judgment that the failure to settle and the

forwarding of the claims to Denmark was illegal. On April 22, 1988, defendants filed a motion to dismiss. Because these claims are governed by the NATO SOFA, and not by the Foreign Claims Act, and because the Air Force has complied with the requirements of that treaty, the complaint fails to state a cause of action upon which relief can be granted. Furthermore, this court lacks jurisdiction to order the Secretary of the Air Force to consider the claims under the Foreign Claims Act.[1]

## I.

■ NATO SOFA, a multilateral treaty to which both the United States and Denmark are parties, is designed "to define the status of [forces of one party] while in the territory of another Party." Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 U.S.T. 1792, 1794 (June 19, 1951) (hereinafter "NATO SOFA"). Article VIII, ¶ 5, deals specifically with torts "arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible, and causing damage in the territory of the receiving State to third parties." Under Article VIII, ¶ 5, claims are to be settled or adjudicated by the "receiving" state (the state in which the tort occurred) according to the laws and regulations that the state applies to the activities of its own armed forces. See NATO SOFA, 4 U.S.T. at 1806. When liability has been established or a settlement made, the "sending" state (the state whose forces committed the tort) then reimburses the receiving state for 75% of the damages pursuant to Article VIII, ¶ 5(e). See id.[2]

The Foreign Claims Act, 10 U.S.C. § 2734, provides, in pertinent part, that

(a) To promote and maintain friendly relations through the prompt settlement of meritorious claims, the Secretary concerned or an officer or employee designated by the Secretary may appoint, under such regulations as the Secretary may prescribe, one or more claims commissions ... to settle and pay in an amount not more than $100,000, a claim against the United States for—

.    .    .    .    .

(3) personal injury to, or death of, any inhabitant of a foreign country;

if the damage, loss, personal injury, or death occurs outside the United States ... and is caused by, or is otherwise incident to noncombat activities of, the armed forces under his jurisdiction, or is caused by a member thereof or by a civilian employee of the military department concerned....

Defendants argue, correctly, that the NATO SOFA, not the Foreign Claims Act, governs all claims involving (1) official duties of the U.S. military (2) causing damage in NATO countries. Looking first to the plain language of the treaty, Article VIII, ¶ 5 of the SOFA uses very broad terminology. The provision applies to all cases, other than those involving contractual obligations, tortious acts or omissions *not* done in the performance of official duty, or unauthorized use of a vehicle, "arising out of acts or omissions of members of a force or civilian component done in the performance of official duty ... causing damage in the territory of the receiving State to third parties."

Although plaintiffs argue that SOFA only applies where either the force at issue is stationed in a NATO country other than its native country or the tort at issue occurred while the force was engaged in a NATO-related mission, neither of these limitations appear on the face of the treaty. Indeed, the treaty defines the receiving

---

**1.** Defendants also moved to dismiss on the grounds that decisions under the Foreign Claims Act and the International Agreement Claims Act are not reviewable and that plaintiffs have raised a nonjusticiable political question. Because the action should be dismissed on the grounds discussed herein, the other arguments need not be addressed.

**2.** The International Agreement Claims Act tracks the language of the NATO SOFA and is in essence an "enabling" statute for the treaty. *See* 10 U.S.C. § 2734a.

state as the state in which the force "is located, *whether it be stationed there or passing in transit.*" NATO SOFA, art. I, ¶ 1(e), 4 U.S.T. at 1794 (emphasis added). Nor is any NATO connection essential to the applicability of the treaty. The negotiating history shows quite clearly that the drafters considered and then expressly rejected a proposal to limit the scope of the treaty to members of armed services "in connexion with the operation of the North Atlantic Treaty." NATO Agreements on Status: Travaux Preparatoires 163 (J. Snee ed. 1966). Rather, the drafters agreed on a simple geographical, not a purposive, test for applicability of the treaty by defining a "force" as members of the armed services "when in the territory of another Contracting Party in the North Atlantic Treaty area in connexion with their official duties." *Id.* at 164; NATO SOFA, art. I, ¶ 1(a), 4 U.S.T. at 1794. While pursuing these official duties, "Article VIII contemplates specifically and pervasively that the 'forces' it governs will normally be under, part of, and identified with their respective contracting Governments, not with some merged 'NATO command.'" *Shafter v. United States*, 273 F.Supp. 152, 159 (S.D.N.Y.1967), *aff'd*, 400 F.2d 584 (2d Cir.1968) (per curiam), *cert. denied*, 393 U.S. 1086, 89 S.Ct. 871, 21 L.Ed.2d 779 (1969).

Plaintiffs suggest in their Memorandum in Opposition to the Defendant's Motion to Dismiss that the United States has never forwarded any claims under the International Agreement Claims Act or NATO SOFA that did not involve forces either stationed in a NATO country other than the United States or involved in a NATO-related mission. This factual information, however, is unsurprising and irrelevant. The number of torts committed in other NATO nations by U.S. troops stationed in the U.S. and not participating in NATO-related missions is bound to be extremely small. But when such an accident does occur, as it did here, the plain language of NATO SOFA includes such an accident within its scope.

Although plaintiffs do not dispute that the accident in Thule occurred within the scope of the U.S. force's official duties,

they do argue that NATO SOFA is not the exclusive remedy for "scope-of-duty" claims and that the United States has in fact settled at least two "official duty" cases under the Foreign Claims Act. In the first, however, there was never an official determination of whether the tort complained of occurred within the scope of official duty. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 20–22 [hereinafter "Plaintiffs' Memorandum"]. The second involved a baseball striking a vehicle and causing damage. Although there is language from a claims officer that ambiguously indicates that the tort was within the "scope of employment," *id.* at 22, a decision that a baseball game is not part of our armed forces' "official duties" within the meaning of SOFA has little relevance to the facts at issue here. Nor is there any showing that the claims officer in the baseball case was challenged by invocation of the treaty.

In any event, legislative history and recent congressional debates tend to confirm that the International Agreement Claims Act, which implements SOFA, is the sole remedy for line-of-duty torts, while the Foreign Claims Act may be invoked for torts committed beyond the scope of official duty or in countries that have not signed the NATO SOFA. *See* Hearings on H.R. 7819 Before the Subcommittee of the Committee on Foreign Affairs: To Provide For The Orderly Settlement of Certain Claims Arising Out of Acts Or Omissions of Civilian Employees and Military Personnel Of The United States In Foreign Countries And Of Civilian Employees And Military Personnel Of Foreign Countries In The United States, House of Representatives, 83rd Cong., 2d Sess. (March 18–19, 1954) at 9, 26, 39–40; H.R.Rep. No. 407, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad. News 4872, 4878.

Finally, the only court that has directly addressed this issue to date held that, for scope-of-duty claims, NATO SOFA provides an exclusive remedy. In *Brown v. Ministry of Defense of the United Kingdom of Great Britain*, 683 F.Supp. 1035

(E.D.Va.1988), two civilians were injured while departing a British naval vessel, which was docked in Norfolk, Virginia, while participating in NATO exercises. The civilians filed suit against the British government directly, but the court dismissed the suit, holding that the provisions of Article VIII, ¶ 5, of the NATO SOFA were exclusive and mandated suit against the government of the receiving state. As the court wrote, "the use of the mandatory 'shall' indicates that the treaty claims provisions were intended as the exclusive scheme under which covered claims were to be made." *Id.* at 1038. Indeed, even plaintiffs admit that the International Agreement Claims Act "codified a procedure by which certain claims made against the U.S. military and arising in foreign countries would be removed from the scope of the [Foreign Claims Act]." Plaintiffs' Memorandum at 10. Thus, although plaintiffs here might prefer to sue the United States under the Foreign Claims Act, NATO SOFA requires that they file suit against the receiving state according to the laws of that state.

Plaintiffs raise two additional interesting arguments. First, they argue that a nation that has not consented to having U.S. forces on their territory should not have to pay 25% of the damages negligently caused by those troops. But in this case Denmark has agreed to take the claims under SOFA. In a letter dated July 26, 1988, addressed to plaintiffs' counsel, and upon which both sides have had an opportunity to comment, the Danish Government has stated that it is currently investigating the claims forwarded to it by the U.S. Air Force, that claims for damages will be handled primarily according to the Danish Occupational Injury Insurance Act, and that any claims not fully covered by that Act will be referred

to the Danish courts. If the Danish government has not objected to the transferring of these claims pursuant to NATO SOFA,[3] plaintiffs cannot invoke concerns about the Danish public fisc in arguing against an application of NATO SOFA to which both parties to that treaty have agreed and which seems plainly in keeping with the language and negotiating history of that treaty. Furthermore, there is no reason to believe that the Danish government will treat these claims with anything but the utmost fairness. Plaintiffs have not shown that they will receive any lesser version of justice in Denmark than they would receive here.[4]

Second, plaintiffs argue that Greenland is not covered by NATO SOFA. Article XX of the SOFA provides that the treaty shall "apply only to the metropolitan territory of a Contracting Party," unless a state notifies the United States that the agreement shall extend "to all or any of the territories for whose international relations it is responsible in the North Atlantic Treaty area." The Defense of Greenland Agreement, signed less than two months before the SOFA, specifically contemplated that Greenland would be covered by the NATO SOFA. Article X of that Agreement states:

Upon the coming into force of a NATO agreement to which the two Governments are parties pertaining to the subjects involved in Articles VII [tax exemption], VIII [jurisdiction over offenses committed by U.S. military and civilian personnel in Greenland] and IX [access of personnel to defense areas] of this Agreement, the provisions of the said articles will be superseded by the terms of such agreement to the extent that they are incompatible therewith. If it should appear that any of the provisions

---

**3.** Plaintiffs have not challenged the Department of Defense regulations that implement the International Agreement Claims Act by directing the Air Force to forward all claims falling within the International Agreement Claims Act to the receiving state. *See* 32 C.F.R. § 842.71(a).

**4.** In addition, according to a stipulation filed on July 29, 1988, the government has agreed to toll the statute of limitations on these claims as of

January 19, 1988, the date when the claims were first filed with the Air Force. Thus, at least as regards the status, if any, of these claims under the Foreign Claims Act, the Military Claims Act, or the *ex gratia* provisions of the NATO SOFA in the event that Denmark subsequently disclaims jurisdiction, there is no showing that the plaintiffs' claims under those provisions would be prejudiced.

of such NATO agreement may be inappropriate to the conditions in Greenland, the two governments will consult with a view to making mutually acceptable adjustments.

Defense of Greenland Agreement, 2 U.S.T. 1485, 1496 (April 27, 1951). Plaintiffs have provided no evidence of consultations between the United States and Denmark designed to remove Greenland from the NATO SOFA. Given the clear intent of the Defense of Greenland Agreement to have Greenland covered by the SOFA, plaintiffs' argument must fall.

## II.

■ Plaintiffs seek mandamus to "[d]irect the Secretary of the Air Force to establish a Foreign Claims Commission to 'settle' Plaintiffs' claims." Complaint at 25. Mandamus is an extraordinary remedy, "long restricted, in the main, to situations where ministerial duties of a nondiscretionary nature are involved." *Panama Canal Co. v. Grace Line*, 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958) (citations omitted). Because the International Agreement Claims Act governs these claims, *see supra*, issuing a writ of mandamus to follow the provisions of the Foreign Claims Act would be inappropriate. In addition, even if these claims were governed by the Foreign Claims Act, mandamus cannot issue because the Secretary has discretion under the Foreign Claims Act to decide whether or not to settle any individual claim.

The Foreign Claims Act provides that the Secretary *"may* appoint … one or more claims commissions … to settle and pay in an amount not more than $100,000, a claim against the United States for … personal injury to, or death of, any inhabitant of a foreign country," if that injury occurs in a foreign country and is caused by the armed forces of the United States. 10 U.S.C. § 2734(a) (emphasis added). The word "may" is the "language of permission and discretion." *Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 455, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979). Under the Foreign Claims Act, the Secretary has no *duty* to settle. Rather, the Act simply authorizes settlement at the Secretary's discretion. And "where there is discretion, … it is impregnable to mandamus." *United States ex rel. Alaska Smokeless Coal Co. v. Lane*, 250 U.S. 549, 555, 40 S.Ct. 33, 36, 63 L.Ed. 1135 (1919).

The only case that plaintiffs cite in opposition to defendant's arguments on the question of mandamus, *NAACP, Jefferson County Branch v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983) does not even discuss the Foreign Claims Act. Although cited for the proposition that "[t]he duty to carry out the mandate of the FCA, IACA, and pertinent regulations is not discretionary," Plaintiffs' Memorandum at 30, that case dealt with the responsibility of the Department of Labor to follow its own regulations and the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, regarding an annual wage-related calculation. Plaintiffs have cited no cases that would indicate that settlement under the Foreign Claims Act is nondiscretionary. Thus, mandamus clearly should not issue.

## III.

For the aforementioned reasons, plaintiffs have failed to state a claim upon which relief can be granted and have failed to establish subject matter jurisdiction over their prayer for mandamus relief. Accordingly, an order accompanying this memorandum shall provide that defendant's motion to dismiss should be, and is, granted.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 22nd day of August, 1988, hereby

ORDERED: that Defendants' Motion to Dismiss is GRANTED.