# ARGENTINE REPUBLIC *v.* AMERADA HESS SHIPPING CORP. ET AL.

No. 87–1372.   Argued December 6, 1988—Decided January 23, 1989

*Bruno A. Ristau* argued the cause for petitioner. With him on the briefs was *Joel E. Leising.*

*Solicitor General Fried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Boulton, Deputy Solicitor General Cohen, Edwin S. Kneedler, Abraham D. Sofaer,* and *Eugene Pinkelmann.*

*Douglas R. Burnett* argued the cause for respondents. With him on the brief were *Raymond J. Burke, Jr., Frances C. Peters,* and *Richard H. Webber.**

---

*Briefs of *amici curiae* urging affirmance were filed for the Republic of Liberia by *Frank L. Wiswall, Jr.;* and for the International Association of Independent Tanker Owners by *Christopher B. Kende.*

Briefs of *amici curiae* were filed for the American Institute of Marine Underwriters by *Marilyn L. Lytle* and *Douglas A. Jacobsen;* for the American Institute of Merchant Shipping et al. by *Michael Joseph;* for the International Human Rights Law Group by *Harry A. Inman;* and for the Maritime Law Association of the United States by *R. Glenn Bauer, Richard W. Palmer,* and *Lizabeth L. Burrell.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Two Liberian corporations sued the Argentine Republic in a United States District Court to recover damages for a tort allegedly committed by its armed forces on the high seas in violation of international law. We hold that the District Court correctly dismissed the action, because the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. § 1330 *et seq.*, does not authorize jurisdiction over a foreign state in this situation.

Respondents alleged the following facts in their complaints. Respondent United Carriers, Inc., a Liberian corporation, chartered one of its oil tankers, the Hercules, to respondent Amerada Hess Shipping Corporation, also a Liberian corporation. The contract was executed in New York City. Amerada Hess used the Hercules to transport crude oil from the southern terminus of the Trans-Alaska Pipeline in Valdez, Alaska, around Cape Horn in South America, to the Hess refinery in the United States Virgin Islands. On May 25, 1982, the Hercules began a return voyage, without cargo but fully fueled, from the Virgin Islands to Alaska. At that time, Great Britain and petitioner Argentine Republic were at war over an archipelago of some 200 islands—the Falkland Islands to the British, and the Islas Malvinas to the Argentineans—in the South Atlantic off the Argentine coast. On June 3, United States officials informed the two belligerents of the location of United States vessels and Liberian tankers owned by United States interests then traversing the South Atlantic, including the Hercules, to avoid any attacks on neutral shipping.

By June 8, 1982, after a stop in Brazil, the Hercules was in international waters about 600 nautical miles from Argentina and 500 miles from the Falklands; she was outside the "war zones" designated by Britain and Argentina. At 12:15 Greenwich mean time, the ship's master made a routine report by radio to Argentine officials, providing the ship's

name, international call sign, registry, position, course, speed, and voyage description. About 45 minutes later, an Argentine military aircraft began to circle the Hercules. The ship's master repeated his earlier message by radio to Argentine officials, who acknowledged receiving it. Six minutes later, without provocation, another Argentine military plane began to bomb the Hercules; the master immediately hoisted a white flag. A second bombing soon followed, and a third attack came about two hours later, when an Argentine jet struck the ship with an air-to-surface rocket. Disabled but not destroyed, the Hercules reversed course and sailed to Rio de Janeiro, the nearest safe port. At Rio de Janeiro, respondent United Carriers determined that the ship had suffered extensive deck and hull damage, and that an undetonated bomb remained lodged in her No. 2 tank. After an investigation by the Brazilian Navy, United Carriers decided that it would be too hazardous to remove the undetonated bomb, and on July 20, 1982, the Hercules was scuttled 250 miles off the Brazilian coast.

Following unsuccessful attempts to obtain relief in Argentina, respondents commenced this action in the United States District Court for the Southern District of New York for the damage that they sustained from the attack. United Carriers sought $10 million in damages for the loss of the ship; Amerada Hess sought $1.9 million in damages for the fuel that went down with the ship. Respondents alleged that petitioner's attack on the neutral Hercules violated international law. They invoked the District Court's jurisdiction under the Alien Tort Statute, 28 U. S. C. § 1350, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Amerada Hess also brought suit under the general admiralty and maritime jurisdiction, 28 U. S. C. § 1333, and "the principle of universal jurisdiction, recognized in customary international law." Complaint of Amerada Hess ¶ 5,

App. 20. The District Court dismissed both complaints for lack of subject-matter jurisdiction, 638 F. Supp. 73 (1986), ruling that respondents' suits were barred by the FSIA.

A divided panel of the United States Court of Appeals for the Second Circuit reversed. 830 F. 2d 421 (1987). The Court of Appeals held that the District Court had jurisdiction under the Alien Tort Statute, because respondents' consolidated action was brought by Liberian corporations, it sounded in tort ("the bombing of a ship without justification"), and it asserted a violation of international law ("attacking a neutral ship in international waters, without proper cause for suspicion or investigation"). *Id.,* at 424–425. Viewing the Alien Tort Statute as "no more than a jurisdictional grant based on international law," the Court of Appeals said that "who is within" the scope of that grant is governed by "evolving standards of international law." *Id.,* at 425, citing *Filartiga* v. *Pena-Irala,* 630 F. 2d 876, 880 (CA2 1980). The Court of Appeals reasoned that Congress' enactment of the FSIA was not meant to eliminate "existing remedies in United States courts for violations of international law" by foreign states under the Alien Tort Statute. 830 F. 2d, at 426. The dissenting judge took the view that the FSIA precluded respondents' action. *Id.,* at 431. We granted certiorari, 485 U. S. 1005 (1988), and now reverse.

We start from the settled proposition that the subject-matter jurisdiction of the lower federal courts is determined by Congress "in the exact degrees and character which to Congress may seem proper for the public good." *Cary* v. *Curtis,* 3 How. 236, 245 (1845); see *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee,* 456 U. S. 694, 701 (1982) (jurisdiction of lower federal courts is "limited to those subjects encompassed within the statutory grant of jurisdiction"). In the FSIA, Congress added a new chapter 97 to Title 28 of the United States Code, 28 U. S. C. § 1602–1611, which is entitled "Jurisdictional Immunities of Foreign

States."[1]  Section 1604 provides that "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of this Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  The FSIA also added § 1330(a) to Title 28; it provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title or under any applicable international agreement."  § 1330(a).[2]

We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts. Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity.  As we said in *Verlinden*, the FSIA "must be applied by the district courts in every action against a foreign

---

[1] From the Nation's founding until 1952, foreign states were "generally granted . . . complete immunity from suit" in United States courts, and the Judicial Branch deferred to the decisions of the Executive Branch on such questions.  *Verlinden B. V. v. Central Bank of Nigeria*, 461 U. S. 480, 486 (1983).  In 1952, the State Department adopted the view that foreign states could be sued in United States courts for their commercial acts, but not for their public acts.  *Id.*, at 487.  "For the most part," the FSIA "codifies" this so-called "restrictive" theory of foreign sovereign immunity. *Id.*, at 488.

[2] Respondents did not invoke the District Court's jurisdiction under 28 U. S. C. § 1330(a).  They did, however, serve their complaints upon petitioner's Ministry of Foreign Affairs in conformity with the service of process provisions of the FSIA, 28 U. S. C. § 1608(a), and the regulations promulgated thereunder by the Department of State, 22 CFR pt. 93 (1988). See App. to Pet. for Cert. 38a, 41a.

sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B. V. v. Central Bank of Nigeria,* 461 U. S. 480, 493 (1983).[3]

The Court of Appeals acknowledged that the FSIA's language and legislative history support the "general rule" that the Act governs the immunity of foreign states in federal court. 830 F. 2d, at 426. The Court of Appeals, however, thought that the FSIA's "focus on commercial concerns" and Congress' failure to "repeal" the Alien Tort Statute indicated Congress' intention that federal courts continue to exercise jurisdiction over foreign states in suits alleging violations of international law outside the confines of the FSIA. *Id.,* at 427. The Court of Appeals also believed that to construe the FSIA to bar the instant suit would "fly in the face" of Congress' intention that the FSIA be interpreted pursuant to "'standards recognized under international law.'" *Ibid.,* quoting H. R. Rep., at 14.

Taking the last of these points first, Congress had violations of international law by foreign states in mind when it enacted the FSIA. For example, the FSIA specifically denies foreign states immunity in suits "in which rights in prop-

---

[3] Subsection (b) of 28 U. S. C. § 1330 provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) where service has been made under [28 U. S. C. § 1608]." Thus, personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605–1607 applies. *Verlinden, supra,* at 485, 489, and n. 14. Congress' intention to enact a comprehensive statutory scheme is also supported by the inclusion in the FSIA of provisions for venue, 28 U. S. C. § 1391(f), removal, § 1441(d), and attachment and execution, §§ 1609–1611. Our conclusion here is supported by the FSIA's legislative history. See, *e. g.,* H. R. Rep. No. 94–1487, p. 12 (1976) (H. R. Rep.); S. Rep. No. 94–1310, pp. 11–12 (1976) (S. Rep.) (FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by sovereign states before Federal and State courts in the United States," and "prescribes . . . the jurisdiction of U. S. district courts in cases involving foreign states").

erty taken in violation of international law are in issue." 28 U. S. C. § 1605(a)(3). Congress also rested the FSIA in part on its power under Art. I, § 8, cl. 10, of the Constitution "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." See H. R. Rep., at 12; S. Rep., at 12. From Congress' decision to deny immunity to foreign states in the class of cases just mentioned, we draw the plain implication that immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions.

As to the other point made by the Court of Appeals, Congress' failure to enact a *pro tanto* repealer of the Alien Tort Statute when it passed the FSIA in 1976 may be explained at least in part by the lack of certainty as to whether the Alien Tort Statute conferred jurisdiction in suits against foreign states. Enacted by the First Congress in 1789, the Alien Tort Statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. § 1350. The Court of Appeals did not cite any decision in which a United States court exercised jurisdiction over a foreign state under the Alien Tort Statute, and only one such case has come to our attention—one which was decided after the enactment of the FSIA.[4]

In this Court, respondents argue that cases were brought under the Alien Tort Statute against foreign states for the unlawful taking of a prize during wartime. Brief for Respondents 18–25. The Alien Tort Statute makes no mention

---

[4] See *Von Dardel* v. *Union of Soviet Socialist Republics*, 623 F. Supp. 246 (DC 1985) (alternative holding). The Court of Appeals did cite its earlier decision in *Filartiga* v. *Pena-Irala*, 630 F. 2d 876 (1980), which involved a suit under the Alien Tort Statute by a Paraguayan national against a Paraguayan police official for torture; the Paraguayan Government was not joined as a defendant.

of prize jurisdiction, and § 1333(2) now grants federal district courts exclusive jurisdiction over "all proceedings for the condemnation of property taken as a prize." In *The Santissima Trinidad*, 7 Wheat. 283, 353–354 (1822), we held that foreign states were not immune from the jurisdiction of United States courts in prize proceedings. That case, however, was not brought under the Alien Tort Statute but rather as a libel in admiralty. Thus there is a distinctly hypothetical cast to the Court of Appeals' reliance on Congress' failure to repeal the Alien Tort Statute, and respondents' arguments in this Court based on the principle of statutory construction that repeals by implication are disfavored.

We think that Congress' failure in the FSIA to enact an express *pro tanto* repealer of the Alien Tort Statute speaks only faintly, if at all, to the issue involved in this case. In light of the comprehensiveness of the statutory scheme in the FSIA, we doubt that even the most meticulous draftsman would have concluded that Congress also needed to amend *pro tanto* the Alien Tort Statute and presumably such other grants of subject-matter jurisdiction in Title 28 as § 1331 (federal question), § 1333 (admiralty), § 1335 (interpleader), § 1337 (commerce and antitrust), and § 1338 (patents, copyrights, and trademarks).[5] Congress provided in the FSIA that "[c]laims of foreign states to immunity should *henceforth* be decided by courts of the United States in conformity with the principles set forth in this chapter," and very likely it

---

[5] The FSIA amended the diversity statute to delete references to suits in which a "foreign stat[e]" is a party either as plaintiff or defendant, see 28 U. S. C. §§ 1332(a)(2) and (3) (1970 ed.), and added a new paragraph (4) that preserves diversity jurisdiction over suits in which foreign states are plaintiffs. As the legislative history explained, "[s]ince jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H. R. Rep., at 14; S. Rep., at 13. Unlike the diversity statute, however, the Alien Tort Statute and the other statutes conferring jurisdiction in general terms on district courts cited in the text did not in 1976 (or today) expressly provide for suits against foreign states.

thought that should be sufficient. § 1602 (emphasis added); see also H. R. Rep., at 12; S. Rep., at 11 (FSIA "intended to preempt any other State and Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns").

For similar reasons we are not persuaded by respondents' arguments based upon the rule of statutory construction under which repeals by implication are disfavored. This case does not involve two statutes that readily could be seen as supplementing one another, see *Wood* v. *United States,* 16 Pet. 342, 363 (1842), nor is it a case where a more general statute is claimed to have repealed by implication an earlier statute dealing with a narrower subject. See *Morton* v. *Mancari,* 417 U. S. 535, 549–551 (1974). We think that Congress' decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA, and the express provision in § 1604 that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605–1607," preclude a construction of the Alien Tort Statute that permits the instant suit. See *Red Rock* v. *Henry,* 106 U. S. 596, 601–602 (1883); *United States* v. *Tynen,* 11 Wall. 88, 92 (1871). The Alien Tort Statute by its terms does not distinguish among classes of defendants, and it of course has the same effect after the passage of the FSIA as before with respect to defendants other than foreign states.

Respondents also argue that the general admiralty and maritime jurisdiction, § 1333(1), provides a basis for obtaining jurisdiction over petitioner for violations of international law, notwithstanding the FSIA. Brief for Respondents 42–49. But Congress dealt with the admiralty jurisdiction of the federal courts when it enacted the FSIA. Section 1605(b) expressly permits an *in personam* suit in admiralty to enforce a maritime lien against a vessel or cargo of a foreign state. Unless the present case is within § 1605(b) or another exception to the FSIA, the statute conferring general

admiralty and maritime jurisdiction on the federal courts does not authorize the bringing of this action against petitioner.

Having determined that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court, we turn to whether any of the exceptions enumerated in the Act apply here. These exceptions include cases involving the waiver of immunity, § 1605(a)(1), commercial activities occurring in the United States or causing a direct effect in this country, § 1605(a)(2), property expropriated in violation of international law, § 1605(a)(3), inherited, gift, or immovable property located in the United States, § 1605(a)(4), noncommercial torts occurring in the United States, § 1605(a)(5), and maritime liens, § 1605(b). We agree with the District Court that none of the FSIA's exceptions applies on these facts. See 638 F. Supp., at 75–77.[6]

Respondents assert that the FSIA exception for noncommercial torts, § 1605(a)(5), is most in point. Brief for Respondents 50–52. This provision denies immunity in a case

> "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U. S. C. § 1605(a)(5).

Section 1605(a)(5) is limited by its terms, however, to those cases in which the damage to or loss of property occurs *in the United States.* Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United

---

[6] The Court of Appeals majority did not pass on whether any of the exceptions to the FSIA applies here. It did note, however, that respondents' arguments regarding § 1605(a)(5) were consistent with its disposition of the case. 830 F. 2d, at 429, n. 3. The dissent found none of the FSIA's exceptions applicable on these facts. *Id.*, at 430 (Kearse, J. dissenting).

States, for which liability is imposed under domestic tort law. See H. R. Rep., at 14, 20–21; S. Rep., at 14, 20–21.

In this case, the injury to respondents' ship occurred on the high seas some 5,000 miles off the nearest shores of the United States. Despite these telling facts, respondents nonetheless claim that the tortious attack on the Hercules occurred "in the United States." They point out that the FSIA defines "United States" as including all "territory and waters, continental and insular, subject to the jurisdiction of the United States," § 1603(c), and that their injury occurred on the high seas, which is within the admiralty jurisdiction of the United States, see *The Plymouth,* 3 Wall. 20, 36 (1866). They reason, therefore, that "by statutory definition" petitioner's attack occurred in the United States. Brief for Respondents 50–51.

We find this logic unpersuasive. We construe the modifying phrase "continental and insular" to restrict the definition of United States to the continental United States and those islands that are part of the United States or its possessions; any other reading would render this phrase nugatory. Likewise, the term "waters" in § 1603(c) cannot reasonably be read to cover all waters over which United States courts might exercise jurisdiction. When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.[7] We thus apply "[t]he canon of construction which teaches that legislation of Congress, unless contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Broth-*

---

[7] See, *e. g.,* 14 U. S. C. § 89(a) (empowering Coast Guard to search and seize vessels "upon the high seas and waters over which the United States has jurisdiction" for "prevention, detection, and suppression of violations of laws of the United States"); 18 U. S. C. § 7 ("special maritime and territorial jurisdiction of the United States" in Federal Criminal Code extends to United States vessels on "[t]he high seas, any other waters within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State"); 19 U. S. C. § 1701 (permitting President to declare portions of "high seas" as customs-enforcement areas).

ers v. *Filardo*, 336 U. S. 281, 285 (1949); see also *Weinberger* v. *Rossi*, 456 U. S. 25, 32 (1982). Because respondents' injury unquestionably occurred well outside the 3-mile limit then in effect for the territorial waters of the United States, the exception for noncommercial torts cannot apply.[8]

The result in this case is not altered by the fact that petitioner's alleged tort may have had effects in the United States. Respondents state, for example, that the Hercules was transporting oil intended for use in this country and that the loss of the ship disrupted contractual payments due in New York. Brief for Respondents 51. Under the commercial activity exception to the FSIA, § 1605(a)(2), a foreign state may be liable for its commercial activities "outside the territory of the United States" having a "direct effect" inside the United States.[9] But the noncommercial tort exception, § 1605(a)(5), upon which respondents rely, makes no mention of "territory outside the United States" or of "direct effects" in the United States. Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States. Respondents do not claim that § 1605(a)(2) covers these facts.

We also disagree with respondents' claim that certain international agreements entered into by petitioner and by

---

[8] The United States has historically adhered to a territorial sea of 3 nautical miles, see *United States* v. *California*, 332 U. S. 19, 32–34 (1947), although international conventions permit a territorial sea of up to 12 miles. See 2 Restatement (Third) of Foreign Relations Law of United States § 511 (1987). On December 28, 1988, the President announced that the United States would henceforth recognize a territorial sea of 12 nautical miles. See Presidential Proclamation No. 5928, 3 CFR 547 (1988).

[9] Section 1605(a)(2) provides, in pertinent part, that foreign states shall not be immune from the jurisdiction of United States courts in cases "in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

the United States create an exception to the FSIA here. Brief for Respondents 17. As noted, the FSIA was adopted "[s]ubject to international agreements to which the United States [was] a party at the time of [its] enactment." § 1604. This exception applies when international agreements "expressly conflic[t]" with the immunity provisions of the FSIA, H. R. Rep., at 17; S. Rep., at 17, hardly the circumstances in this case. Respondents point to the Geneva Convention on the High Seas, Apr. 29, 1958, [1962] 13 U. S. T. 2312, T. I. A. S. No. 5200, and the Pan American Maritime Neutrality Convention, Feb. 20, 1928, 47 Stat. 1989, 1990–1991, T. S. No. 845. Brief for Respondents 31–34. These conventions, however, only set forth substantive rules of conduct and state that compensation shall be paid for certain wrongs.[10] They do not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts. Cf. *Head Money Cases*, 112 U. S. 580, 598–599 (1884); *Foster* v. *Neilson*, 2 Pet. 253, 314 (1829). Nor do we see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of

---

[10] Article 22(1), (3), of the Geneva Convention on the High Seas, 13 U. S. T., at 2318–2319, for example, states that a warship may only board a merchant ship if it has a "reasonable ground for suspecting" the merchant ship is involved in piracy, the slave trade, or traveling under false colors. If an inspection fails to support the suspicion, the merchant ship "shall be compensated for any loss or damage that may have been sustained." Article 23 contains comparable provisions for the stopping of merchant ships by aircraft. Similarly, Article 1 of the Pan American Maritime Neutrality Convention, 47 Stat., at 1990, 1994, permits a warship to stop a merchant ship on the high seas to determine its cargo, and whether it has committed "any violation of blockade," but the warship may only use force if the merchant ship "fails to observe the instructions given it." Article 27 provides: "A belligerent shall indemnify the damage caused by its violation of the foregoing provisions. It shall likewise be responsible for the acts of persons who may belong to its armed forces."

action in the United States. We find similarly unpersuasive the argument of respondents and *Amicus Curiae* Republic of Liberia that the Treaty of Friendship, Commerce and Navigation, Aug. 8, 1938, United States-Liberia, 54 Stat. 1739, T. S. No. 956, carves out an exception to the FSIA. Brief for Respondents 52–53; Brief for the Republic of Liberia as *Amicus Curiae* 11. Article I of this Treaty provides, in pertinent part, that the nationals of the United States and Liberia "shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws." The FSIA is clearly one of the "local laws" to which respondents must "conform" before bringing suit in United States courts.

We hold that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country, and that none of the enumerated exceptions to the Act apply to the facts of this case. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, concurring in part.

I join the Court's opinion insofar as it holds that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court. *Ante*, at 431–439.

I, however, do not join the latter part of the Court's opinion to the effect that none of the FSIA's exceptions to foreign sovereign immunity apply in this case. As the majority notes, the Court of Appeals did not decide this question, *ante*, at 439, n. 6, and, indeed, specifically reserved it. 830 F. 2d 421, 429, n. 3 (CA2 1987). Moreover, the question was not among those presented to this Court in the petition for certiorari, did not receive full briefing, and is not necessary to the disposition of the case. Accordingly, I believe it inappropriate to decide here, in the first instance, whether any exceptions to the FSIA apply in this case. See this Court's Rule 21.1(a) (Court will consider only questions presented in

petition); *Youakim* v. *Miller*, 425 U. S. 231, 234 (1976) (Court ordinarily will not decide questions not passed on below). I would remand the case to the Court of Appeals on this issue.