Robert E. MOORE, a single man,
Plaintiff–Appellant,

v.

The UNITED KINGDOM, a foreign government; Kenneth Southall; John Does, I–X, Defendants–Appellees.

No. 01–36146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 2004.

Filed Sept. 23, 2004.

---

J. Bryon Holcomb, Bainbridge Island, WA, for the plaintiff-appellant.

Sushma Soni, Appellate Staff, Civil Division, United States Department of Justice for the amicus curiae.

Before B. FLETCHER, HAMILTON,[*] and BERZON, Circuit Judges.

BERZON, Circuit Judge.

This case, which centers on a January 1997 bar fight in Tacoma, Washington, raises several questions of first impression in this circuit. Central among them is whether the North Atlantic Treaty Organization Status of Forces Agreement

(NATO–SOFA), June 19, 1951, 4 U.S.T. 1792, TIAS No. 2846, precludes suit against the United Kingdom under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602 *et seq.*, for noncommercial torts committed by its servicemen while present within the United States. We conclude that, pursuant to the NATO–SOFA, Moore's exclusive tort remedy based on the allegations in his complaint is a suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* We therefore affirm the district court's dismissal of Moore's FSIA claim for lack of jurisdiction. We also affirm the district court's dismissal of Moore's claim under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, albeit on different grounds.

## I. Background

On the evening of January 17, 1997, Kenneth Southall and several other members of the British military started a bar fight with Robert E. Moore, the plaintiff-appellant in this case, at the Lakewood Bar and Grill in Tacoma, Washington.[1] Moore sustained serious injuries in the altercation. On January 11, 2000, Moore filed this lawsuit, against Southall, ten unnamed members of the British military, and the government of the United Kingdom, in the United States District Court for the Western District of Washington. The complaint stated two counts: Count I, styled as a "Freedom of Information Act request," seeks an order against the British government requiring the production of certain documents related to the incident. Count II seeks damages against Southall, the Doe co-defendants, and the United Kingdom, under the noncommercial tort exception to the FSIA, 28 U.S.C. § 1605(a)(5).

---

[*] The Honorable Clyde H. Hamilton, Senior United States Circuit Judge for the Fourth Circuit, sitting by designation.

1. All the facts recounted here are taken from the complaint. The defendants have never appeared in this suit.

When none of the defendants appeared in the district court, Moore filed a motion for an order of default. Shortly thereafter, the United States filed an application for leave to appear as amicus curiae, along with a "Suggestion of Lack of Subject Matter Jurisdiction." The district court granted the application, and, on October 18, 2001, ruled that it lacked subject-matter jurisdiction and, for that reason, declined to resolve any of the outstanding default and disclosure issues.

Specifically, the court held that, because of the NATO–SOFA,

> Moore's only claim giving rise to jurisdiction in this Court is a claim against the armed forces of the host nation itself. Because Moore's claim is against the United Kingdom, rather than the United States, and directly implicates British forces while in the line of duty within the United States, this Court lacks subject matter jurisdiction.

(citation omitted). Because the district court found that it also lacked jurisdiction over the FOIA claim against the United Kingdom, it dismissed that claim as well. After so concluding, the district court dismissed the case without prejudice. This timely appeal followed.

## II. Analysis

### A. The Foreign Sovereign Immunities Act of 1976

 The existence of subject matter jurisdiction under the FSIA is a question of law reviewed de novo. *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1470 (9th Cir.1994). Enacted in 1976, the Foreign Sovereign Immunities Act is:

a comprehensive statute containing a "set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." The Act "codifies, as a matter of federal law, the restrictive theory of sovereign immunity," and transfers primary responsibility for immunity determinations from the Executive to the Judicial Branch.

*Republic of Austria v. Altmann,* —— U.S. ——, ——, 124 S.Ct. 2240, 2249, 159 L.Ed.2d 1 (2004) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)) (citations omitted). The FSIA thus ordinarily " 'provides the exclusive source of subject matter jurisdiction over suits involving foreign states and their instrumentalities,' " as " 'foreign states are presumed to be immune from the jurisdiction of United States courts unless one of the Act's exceptions to immunity applies.' " *Coyle v. P.T. Garuda Indonesia,* 363 F.3d 979, 983 n. 5 (9th Cir.2004) (quoting *Gates v. Victor Fine Foods,* 54 F.3d 1457, 1459 (9th Cir.1995)) (citations omitted).

Subject-matter jurisdiction for claims brought against foreign states under the FSIA is conferred by 28 U.S.C. § 1330(a),[2] which provides that

> The district courts shall have original jurisdiction ... of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.[3]

---

2. Jurisdiction is also conferred by the FSIA for diversity actions in which a foreign state is the plaintiff. *See* 28 U.S.C. § 1332(a)(4); *Altmann,* —— U.S. at ——, 124 S.Ct. at 2249.

3. This last provision of § 1330(a) suggests a point largely overlooked in the case law, albeit one we need not reach in this case: Even if a foreign state is entitled to immunity under the FSIA (i.e., because none of the exceptions in §§ 1605–1607 apply), there may be federal

Thus, federal courts have been held to have jurisdiction over foreign states as defendants under the FSIA only when that state is not entitled to immunity—that is, when one of the statutory exceptions applies. *See, e.g., Altmann,* —— U.S. at ——, 124 S.Ct. at 2249 (" 'At the threshold of every action in a district court against a foreign state, ... the court must satisfy itself that one of the exceptions applies,' as 'subject-matter jurisdiction in any such action depends' on that application." (quoting *Verlinden,* 461 U.S. at 493–94, 103 S.Ct. 1962)); *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) ("[U]nless a specified exception applies, a federal court lacks subject matter-jurisdiction over a claim against a foreign state.").[4]

One of the Act's exceptions from immunity, the "non-commercial tort" exception, applies to suits

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment....

28 U.S.C. § 1605(a)(5). As we summarized in *Randolph v. Budget Rent–A–Car,*

> In order to find that a foreign sovereign can be sued under the tortious activity exception [§ 1605(a)(5)], the court must find: (1) that the tortious acts of individual employees of the sovereign were undertaken while in the scope of employment, and (2) that the claim is not based upon the exercise or failure to exercise a discretionary function. Because this case does not involve a discretionary function, only employment and scope of employment issues are in question.

97 F.3d 319, 325 (9th Cir.1996) (citing *Joseph v. Office of Consulate Gen. of Nig.,* 830 F.2d 1018, 1025 (9th Cir.1987)).[5] Were this personal injury suit governed by the noncommercial tort exception to the FSIA, our inquiry would be guided by these standards.

**B. Status–of–Forces Agreements and the FSIA**

Unlike *Randolph,* however, this suit was brought against foreign *servicemen.* Litigation against members of foreign military forces who are within the United States (and against members of the U.S. military abroad) is guided by so-called status-of-

---

jurisdiction for claims arising out of an "applicable international agreement" if that agreement specifically bars a foreign state's immunity thereunder.

**4.** A curious feature of the FSIA and the cases interpreting it is the assumption that the very existence of immunity creates a jurisdictional bar. Ordinarily, immunity from suit, including sovereign immunity, must be invoked to be effective; courts need not dismiss as outside their jurisdiction suits in which sovereign immunity could be invoked but is not. *See, e.g., Wis. Dep't of Corr. v. Schacht,* 524 U.S. 381, 388–89, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); *Armstrong v. Davis,* 275 F.3d 849, 877 (9th Cir.2001) ("[A]lthough [sovereign immunity is] in the nature of a jurisdictional bar, it does not actually 'implicate a federal court's

subject matter jurisdiction in any ordinary sense' and thus may be 'forfeited by the State's failure to assert it.' ") (quoting *ITSI TV Prods., Inc. v. Agric. Ass'ns,* 3 F.3d 1289, 1291 (9th Cir.1993)), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72 (2002). Curiously, one *exception* to immunity under the FSIA is *waiver* of immunity by the defendant. 28 U.S.C. § 1605(a)(1). Though it seems anomalous for Congress to create federal subject-matter jurisdiction based purely on waiver, the Supreme Court has consistently treated immunity as a jurisdictional bar under the FSIA, so we do the same.

**5.** As in *Randolph,* the discretionary function exception, 28 U.S.C. § 1605(a)(5)(A), is inapplicable here.

forces agreements, or "SOFAs." *See In re Burt,* 737 F.2d 1477, 1479 n. 2 (7th Cir. 1984); Richard J. Erickson, *Status of Forces Agreements: A Sharing of Sovereign Prerogative,* 37 A.F. L. REV. 137 (1994). Litigation in this country against members of the British military is governed by the NATO–SOFA. *See Brown v. Ministry of Defense,* 683 F.Supp. 1035 (E.D.Va.1988).

### 1. "Subject to existing international agreements...."

■ The first issue we must resolve is the relationship between the NATO–SOFA and the FSIA. The central provision of the FSIA, 28 U.S.C. § 1604, provides:

> *Subject to existing international agreements* to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

(emphasis added).

Although this language is critical, its meaning is not entirely transparent. Does "subject to existing international agreements" modify only "shall be immune," so that "existing international agreements" can only permit suits against foreign states where the FSIA would not? Or are the *exceptions* specified in §§ 1605–1607 also "subject to existing international agreements," so that such agreements can preclude suit where the FSIA would otherwise allow it? No court has explicitly resolved this issue. *See, e.g., Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 719 (9th Cir.1992) (discussing § 1604's language without resolving this question).

In *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct.

683, 102 L.Ed.2d 818 (1989), however, the Supreme Court provided some guidance. *Amerada Hess* held that the "treaty exception" intended by the "subject to existing international agreements" phraseology "applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA." *Id.* at 442, 109 S.Ct. 683 (quoting H.R.Rep. No. 94–1487, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616) (alteration in original). This language suggests that any conflict with the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception.

Although there is no other pertinent judicial precedent, the House Report accompanying the FSIA is clear on this point:

> Like other provisions in the bill, section 1605 is subject to existing international agreements (see section 1604), including Status of Forces Agreements; if a remedy is available under a Status of Forces Agreement, the foreign state is immune from such tort claims as are encompassed in sections 1605(a)(2) and 1605(a)(5).

H.R. REP. NO. 94–1487, at 21, *reprinted in* 1976 U.S.C.C.A.N. at 6620; [6] *see also id.* at 17, *reprinted in* 1976 U.S.C.C.A.N. at 6616("*All* immunity provisions in sections 1604 through 1607 are made subject to 'existing' treaties and other international agreements to which the United States is a party. In the event an international agreement expressly conflicts with the [FSIA], the international agreement would control." (emphasis added)).

■ This "conflict" reading of § 1604 is the only sensible one. Under this interpretation of the FSIA, preexisting international agreements could either expand or contract a foreign nation's amenability to

---

**6.** The only court in our circuit to consider the meaning of § 1604 found this passage from the legislative history conclusive. *See Green-*

*peace, Inc. (U.S.A.) v. State of France,* 946 F.Supp. 773, 787–88 (C.D.Cal.1996) (Wardlaw, J.).

suit as compared to that provided under the FSIA. To read § 1604 otherwise, as permitting pre-existing international agreements only to expand a foreign state's exposure to suit but not to limit it, would allow the FSIA implicitly to trump treaties precluding certain kinds of suits against foreign nations. Given the lack of any specific indication that Congress intended this alternate construction, we follow the canon of statutory interpretation that "acts of Congress should not be construed to conflict with international treaty obligations." *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441–42 (9th Cir.1996) (citing *Sale v. Haitian Ctrs. Council, Inc.*; 509 U.S. 155, 178, 113 S.Ct. 2549, 125 L.Ed.2d 128 n. 35 (1993)). We therefore hold that the FSIA in its entirety is subject to such "existing international agreements." If there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a 'contracting state, the agreement prevails.

The NATO–SOFA pre-dated the FSIA, and is therefore one of the "existing international agreements" covered by the caveat in § 1604. *See* H.R.Rep. No. 94–1487, at 17, *reprinted in* 1976 U.S.C.C.A.N. at 6616 ("[T]he [FSIA] would not alter the rights or duties of the United States under the NATO Status of Forces Agreement or similar agreements with other countries. . . ."). Because the FSIA is subject to the NATO–SOFA, whether Moore's FSIA claim may go forward turns on two inquiries: Does the NATO–SOFA apply in this case? If so, does it "expressly conflic[t]," *Amerada Hess*, 488 U.S. at 442, 109 S.Ct. 683 (alteration in original) (internal quotation marks omitted), with the FSIA? If the NATO–SOFA applies and conflicts with the FSIA, then the defendants may not be sued under the FSIA.

### 2. Application of the NATO–SOFA

Two provisions of the NATO–SOFA are central to this case. First, Article I, paragraph 1 defines "force" for purposes of the agreement to mean "the personnel belonging to the land, sea, or air armed services of one Contracting Party when in the territory of another Contracting Party in the North Atlantic Treaty area in connexion with their official duties . . . ." NATO–SOFA, art. I, ¶ 1(a), 4 U.S.T. at 1794. The treaty goes on to state that "the two Contracting Parties concerned may agree that certain individuals, units, or formations shall not be regarded as constituting or included in a 'force' for the purposes of the present Agreement." *Id.*

Under the basic definition, Southall and the other ten Doe defendants were all members of a "force" at the time of the Tacoma incident: The complaint alleges that they were active members of the British military present within the United States on active duty for the purposes of training exercises. They therefore were here "in connexion with their official duties."

Moore argues that the district court could not have known whether these defendants fall under the exception to the "force" definition, i.e., whether Britain and the United States had agreed that any of the individuals named as defendants should "not be regarded as constituting or included in a 'force'" under the NATO–SOFA. Moore, however, points to no such agreement.[7] As he is relying on an exception within the text of the treaty, the burden is on him to show that the exception applies. *See, e.g., United States v. Henry*, 615 F.2d 1223, 1234–35 (9th Cir.1980) (articulating the "well-established rule . . . that a [party] who relies upon an exception

---

7. For an example of such an agreement, see Status of Personnel of Military Assistance Advisory Group and Offshore Procurement Program, U.S.-Den., Dec. 12, 1956, 9 U.S.T. 271.

to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception."). Because Moore has not alleged any agreement in his complaint, we conclude that the defendants all come under the terms of the NATO–SOFA.

### 3. The Assimilation Provision

■ The other key provision of the NATO–SOFA appears in Article VIII, paragraph 5:

> Claims ... arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission, or occurrence for which a force or civilian component is legally responsible, and causing damage in the territory of the receiving State to third parties, other than any of the Contracting Parties, shall be dealt with by the receiving State in accordance with the following provisions:—
>
> (a) Claims shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of *its own armed forces.*

NATO–SOFA, art. VIII, ¶ 5, 4 U.S.T. at 1806 (emphasis added).[8] We observed some time ago that "this provision does suggest ... that the foreign serviceman is 'assimilated' into the United States military for this limited consideration." *Daberkow v. United States*, 581 F.2d 785, 789 (9th Cir.1978). *Daberkow* thus assumed that subparagraph (a) does not simply provide that suit can be filed against the foreign nation on the same basis that suit could be filed against the United States were the defendants our armed forces or members thereof. Instead, *Daberkow* suggested that, as the district court put the matter in this case, "under this treaty, foreign servicemen are effectively considered members of the United States military for purposes of claims arising out of acts or omissions of the servicemen."

Although we have never squarely so held, the NATO–SOFA's ratification history supports this conclusion. *See* S. Exec. Rep. No. 1, 83d Cong., 1st Sess., at 13–14 (1953) ("In the case of torts committed in the performance of duty, the local citizen who is injured proceeds against his own government exactly as he would if the injury had been caused by a member of his own government's armed forces.").[9] So do the decisions of every district court that has looked at this question. *See, e.g.,*

---

**8.** As here pertinent, the remainder of paragraph 5 provides:

(b) The receiving State may settle any such claims, and payment of the amount agreed upon or determined by adjudication shall be made by the receiving State in its currency.

(d) Every claim paid by the receiving State shall be communicated to the sending States concerned together with full particulars and a proposed distribution in conformity with sub-paragraphs (e)(i), (ii) and (iii) below. In default of a reply within two months, the proposed distribution shall be regarded as accepted.

(e) The cost incurred in satisfying claims pursuant to the preceding sub-paragraphs and paragraph 2 of this Article shall be distributed between the Contracting Parties, as follows:

(c) Such payment, whether made pursuant to a settlement or to adjudication of the case by a competent tribunal of the receiving State, or the final adjudication by such a tribunal denying payment, shall be binding and conclusive upon the Contracting Parties.

—

(i) Where one sending State alone is responsible, the amount awarded or adjudged shall be distributed in the proportion of 25 per cent. [sic] chargeable to the receiving State and 75 per cent. [sic] chargeable to the sending State.

NATO–SOFA, art. VIII, ¶ 5, 4 U.S.T. at 1806.

**9.** As Congress later indicated when amending the NATO–SOFA's implementing legislation, "The fundamental principle[ of the NATO–SOFA], as was stated at the outset, is that the

*Greenpeace,* 946 F.Supp. at 788("Under the framework established by NATO–SOFA, the foreign serviceman is 'merged' or 'assimilated' into the United States military for the purposes of claims arising out of the acts or omissions of that foreign serviceman."); *Lowry v. Commonwealth of Canada,* 917 F.Supp. 290, 291 (D.Vt.1996); *Aaskov v. Aldridge,* 695 F.Supp. 595, 596–99 (D.D.C.1988); *Brown,* 683 F.Supp. at 1037–40; *Shafter v. United States,* 273 F.Supp. 152, 153–57 (S.D.N.Y.1967), *aff'd,* 400 F.2d 584 (2d Cir.1968).

The decisive support for construing this part of the NATO–SOFA as a merger provision comes from a contemporaneous Act of Congress—the International Agreement Claims Act of 1954, Pub.L. No. 83–734, 68 Stat. 1006 (codified as amended at 10 U.S.C. §§ 2734a–2734b). Under the Act,

> When the United States is a party to an international agreement which provides for the settlement or adjudication by the United States under its laws and regulations, and subject to agreed pro rata reimbursement, of claims against another party to the agreement arising out of the acts or omissions of a member or civilian employee of an armed force of that party done in the performance of official duty, or arising out of any other act, omission, or occurrence for which

that armed force is legally responsible under applicable United States law, ... claims may be prosecuted against the United States, or settled by the United States, in accordance with the agreement, as if the acts or omissions upon which they are based were the acts or omissions of a member or a civilian employee of an armed force of the United States.

10 U.S.C. § 2734b(a).[10] Enacted specifically to codify the cost-sharing reimbursement procedures of the NATO–SOFA, *see Eyskens v. United States,* 140 F.Supp.2d 553, 557 (E.D.N.C.2000); *Niedbala v. United States,* 37 Fed. Cl. 43, 46–47 (1996), the Act "implements article VIII[of the NATO–SOFA] by authorizing funds for payment of SOFA claims, be they NATO SOFA or other SOFAs. The United States pays a pro rata share of awards as determined by the relevant SOFA." *Niedbala,* 37 Fed. Cl. at 46. Thus, Congress, in "enabling" the NATO–SOFA claims procedures by enacting them into federal law, *see Aaskov,* 695 F.Supp. at 596 n. 2, understood article VIII as a merger provision, an interpretation we follow today.

Moore's complaint alleges that Southall and the other ten unnamed defendants were acting within their official capacity. This suit is therefore governed by Article VIII, paragraph 5 of the NATO–SOFA,[11]

---

receiving state is charged with the responsibility of settling and paying claims arising from the activities of the Armed Forces of a sending state and its territory as if caused by its own military activity." S. Rep. No. 94–1121, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2088, 2090.

10. The International Agreement Claims Act might render our detailed reading of the NATO–SOFA superfluous save for two considerations: First, the FSIA speaks only of being "subject to existing international agreements," and not being subject to existing legislation. Thus, Moore's FSIA claim turns on whether it is covered by the NATO–SOFA,

and not whether it falls under the International Agreement Claims Act. Second, and related, the Act only provides that "claims *may* be prosecuted against the United States." On its own, then, it is not necessarily exclusive.

11. Had Moore alleged, instead, that Southall and his co-defendants were *not* acting within the scope of their official duties, then his claim would have been governed by Article VIII, paragraph 6 of the NATO–SOFA, and would have given rise to the diplomatic remedy provided by the treaty, or to any private legal remedy available against the individual soldiers. Such a claim, which is not before us, would not have been cognizable under the

and Moore "must pursue such claims as though he . . . were injured by the armed forces of the host nation itself." *Green-peace*, 946 F.Supp. at 788. In short, "the effect of [NATO-]SOFA is to make the United States the only appropriate defendant in this suit." *Lowry*, 917 F.Supp. at 291.

 The FSIA, of course, provides for suits against foreign nations, not against the United States. Further, any suit against the United States for a tort by an employee during the course of employment would have to be filed under the FTCA. *See* 28 U.S.C. § 2679. The intentional tort exception to the FTCA, 28 U.S.C. § 2680(h), bars certain types of claims arising out of intentional, scope-of-duty torts, including "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *See Orsay v. U.S. Dep't of Justice*, 289 F.3d 1125, 1132–36 (9th Cir.2002) (discussing the intentional tort exception to the FTCA). By contrast, the FSIA does not bar assault, or most other intentional torts,[12] when committed within the scope of duty. *See, e.g.,* 28 U.S.C. § 1605(a)(5)(B). The NATO–SOFA thus "expressly conflicts" with the FSIA in both

these respects and, therefore, precludes relief under the FSIA.

As the NATO–SOFA controls, there is no jurisdiction under the FSIA over Moore's suit against the United Kingdom.

As noted, Moore's only remedy based on the allegations in his complaint is a suit against the United States under the FTCA. Such a claim is now (and would have been, as of the date Moore filed this suit in the district court) time-barred under 28 U.S.C. § 2401(b).[13] Additionally, the FTCA does not permit suits against the United States "arising out of assault." 28 U.S.C. § 2680(h). Thus, even if his suit were timely, Moore could not have proceeded under the FTCA. There is no basis, consequently, for allowing amendment of the complaint to name the United States as defendant, as any such amendment would be futile. *See Deutsch v. Turner Corp.*, 324 F.3d 692, 718 n. 20 (9th Cir. 2003) (denying leave to amend complaint where such amendment would be futile because the statute of limitations had run at the time suit was filed).

## C. Moore's FOIA Claim

Count I of Moore's complaint sought various documents and records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, in connection with the inci-

---

FSIA, since that statute provides jurisdiction only for scope-of-employment torts. *See* 28 U.S.C. § 1605(a)(5).

Nevertheless, we fail to see the relevance of the government's assertion that the United Kingdom found that the individual defendants were not acting within the scope of their employment. Moore's complaint alleges otherwise. If the complaint otherwise stated a cause of action, Moore would have the opportunity to challenge whether that allegation is correct, either in this court, or before a neutral arbitrator, as provided by the NATO–SOFA. *See* NATO–SOFA, art. VIII,¶ 8, 4 U.S.T. at 1808 (providing that an arbitrator should resolve any dispute over whether an

act was in performance of official duty); *see also* 10 U.S.C. § 2734b(b).

**12.** The FSIA bars the same intentional torts as the FTCA, except it does not bar assault, battery, false imprisonment, and false arrest. *See* 28 U.S.C. § 1605(a)(5)(B).

**13.** 28 U.S.C. § 2401(b) provides that

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

dent at the Lakewood Bar and Grill. The district court did not explain the reason it dismissed Count I of the complaint,[14] but the government maintains on appeal that, as with Moore's request for damages, this request, too, is covered and resolved by the NATO–SOFA. Specifically, the government's explanation is that, "[b]ecause this document request 'aris[es] out of' the same tortious acts giving rise to plaintiff's personal injury claim, it is likewise covered by NATO–SOFA." We disagree.

■■■■ FOIA claims are, by their nature, simply requests for governmental information, and thus "arise" only out of agency denials of properly filed FOIA claims. *See, e.g., Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072 (9th Cir. 2004). "A person seeking information under the FOIA ... need not have a personal stake in the information sought," *McDonnell v. United States*, 4 F.3d 1227, 1237–38 (3d Cir.1993), but need only follow the proper procedures for filing an administrative FOIA claim and then challenge its denial. *See Hymen v. Merit Sys. Prot. Bd.*, 799 F.2d 1421, 1423 (9th Cir.1986), *overruled on other grounds by Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Nothing more is necessary—no involvement in the matter about which information is sought, and no articulated reason for wanting the information. The requesting individual may be doing historical research, for example, or may just be curious about someone or some event; the request need not specify a particular event at all, but could sweep more broadly and generally. Because a FOIA claim only arises once an agency denies a document request, and runs in favor of anyone, whether or not involved in—or even aware of—matters discussed in the document sought, the government's argument that Moore's FOIA claim "arises out of" the bar fight is without merit.

■■■■ Moore's argument on this point, that "[t]here is no reason not to order the United Kingdom to produce these records," (Appellant's Br. at 8), is, however, equally meritless. Just because the request for records is not covered by the NATO–SOFA does not mean that Moore is entitled to sue the United Kingdom under FOIA. No cause of action[15] lies under FOIA against a foreign government. FOIA applies only to agencies of the executive branch of the United States government. 5 U.S.C. §§ 551(1), 552(f); *see also Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 83 (1st Cir.1997).

■■■■ Moore neither named the United States or any agency or official of the United States as a defendant in his Complaint nor alleged any withholding of information by any agency or official of the U.S. government. *See Schiffer v. FBI*, 78 F.3d 1405, 1408 (9th Cir.1996) (outlining the typical procedures in a FOIA case). Absent some allegation concerning the federal government, he does not state a FOIA claim.

If it is information from the *British* government that Moore seeks, he has a

---

**14.** In denying Moore's motion to alter or amend the judgment, the district court, which had not addressed any of Moore's other arguments in its original decision, concluded that "[a]lthough Plaintiff raises several grievances with the Court's failure to address certain issues during the course of this litigation, it fails to address the Court's determination that it lacked jurisdiction to hear the case."

**15.** Even if there were a conceivable FOIA-based cause of action against a foreign government, the foreign government would enjoy immunity from the claim under the FSIA unless the claim falls within one of the FSIA's enumerated exceptions. The FSIA's exceptions do not extend to requests for public governmental information. *See* 28 U.S.C. § 1605.

remedy in the *British* courts, via the Freedom of Information Act, 2000, c. 36 (Eng.), a statute closely analogous to FOIA. Whether Moore chooses to pursue a FOIA claim in U.S. courts against the U.S. government, or in English courts against the British government, there is nothing currently before this court that merits any ruling on the merits of Moore's claim to the requested documents.

▮▮▮▮ Even though the district court erred in dismissing the FOIA claim because of its conclusion that it lacked jurisdiction to consider the FSIA claim, "we may affirm on any ground supported by the record." *McQuillion v. Schwarzenegger,* 369 F.3d 1091, 1096 (9th Cir.2004). The viability of Moore's FOIA claim determines whether he was entitled to a default judgment against the United Kingdom, or whether, instead, the claim should have been dismissed for failure to state a claim for which relief could be granted. *See* FED. R. CIV. P. 12(b)(6). The FSIA provides that "[n]o judgment by default shall be entered by a court of the United States ... against a foreign state ... unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision, which mirrors Federal Rule of Civil Procedure 55(e),[16] codifies in the FSIA context the long-standing presumption that due process requires plaintiffs seeking default judgments to make out a prima facie case. *See, e.g., TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir.

1987). Thus, if Moore has not adequately alleged that he has "a claim or right to relief" under FOIA,[17] he is not entitled to a default judgment, and dismissal for failure to state a claim is proper. Since, as discussed above, FOIA claims cannot run against the United Kingdom, Moore has not adequately alleged that he has "a claim or right to relief" under FOIA, and his FOIA claim could—and should—have been dismissed.

### III. Conclusion

The district court's dismissal of Moore's FSIA claim for lack of subject-matter jurisdiction is AFFIRMED. Its dismissal of Moore's FOIA claim is also affirmed, for failure to allege a viable cause of action.

**AFFIRMED.**

---

**16.** Rule 55(e) requires the same "claim or right to relief" showing in suits against the United States, and has been interpreted as requiring district courts to reach the merits of a plaintiff's claim before entering a default judgment against the government. *See Borzeka v. Heckler,* 739 F.2d 444, 446 (9th Cir. 1984).

**17.** Although § 1608(e) speaks in terms of "evidence satisfactory to the court," that section,

of course, is subject to the Federal Rules of Civil Procedure. Under the rules, dismissal is appropriate whenever the complaint does not allege a viable cause of action. *See* FED. R. CIV. P. 12(b)(6). We therefore read § 1608(e) as precluding a default judgment where the claimant does not in his pleadings "establish his claim or right to relief" even if all of the allegations in the complaint are taken as true.